**WO**

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Resana Malone,<br><br>                    Plaintiff,<br><br>v.<br><br>Kilolo Kijakazi,<br>Acting Commissioner of Social Security,<br><br>                    Defendant. | No. CV-21-00214-TUC-DCB (BGM)<br><br><br>**ORDER** |

Currently pending before the Court is Plaintiff Resana Malone's Opening Brief (Doc. 21). Defendant filed her Answering Brief ("Response") (Doc. 22), and Plaintiff replied ("Reply") (Doc. 23). Plaintiff brings this cause of action for review of the final decision of the Commissioner for Social Security pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). Compl. (Doc. 1). The Court will deny Plaintiff's Opening Brief (Doc. 21) and affirm the Commissioner's decision.

## I.    BACKGROUND

### A.    *Procedural History*

On February 11, 2019, Plaintiff protectively filed a Title II application for Social Security Disability Insurance Benefits ("DIB"), as well as a Title XVI application for Supplemental Security Income ("SSI"), alleging disability as of December 1, 2017, due to valley fever, depression, anxiety, neuropathy, asthma, severe sciatica, carpal tunnel, spinal stenosis, chronic pain, and lower back pain.[1] *See* Administrative Record ("AR") at 19, 42–

---

[1] Plaintiff filed a prior application under Title II on January 24, 2018. *See*

45, 73, 75, 77–78, 80–81, 91–92, 94–96, 105, 107, 109–10, 114–15, 126–27, 131–33, 259, 263, 275, 285, 324, 347, 354.  The Social Security Administration ("SSA") denied these applications on April 2, 2019.  *Id.* at 19, 73–104, 151–55.  On May 8, 2019, Plaintiff filed a request for reconsideration, and on July 24, 2019, SSA denied Plaintiff's application upon reconsideration.  *Id.* at 19, 105–42, 156–75.  On August 22, 2019, Plaintiff filed her request for hearing.  *Id.* at 19, 176–77, 352.  On August 28, 2020, a telephonic hearing was held before Administrative Law Judge ("ALJ") Charles Davis.  AR at 19, 39–59.  On October 9, 2020, the ALJ issued an unfavorable decision.  *Id.* at 13–33.  On December 8, 2020, Plaintiff requested review of the ALJ's decision by the Appeals Council, and on April 15, 2021, review was denied.  *Id.* at 1–6, 221–24, 367–69.  On May 21, 2021, Plaintiff filed this cause of action.  Compl. (Doc. 1).

### B.    Factual History

Plaintiff was fifty (50) years old at the time of the alleged onset of her disability and fifty-three (53) years old at the time of the administrative hearing.  AR at 19, 39, 73, 75, 77–78, 80–81, 91–92, 94–96, 105, 107, 109–10, 114–15, 126–27, 131–33, 216, 225, 227, 259, 285, 324, 354.  Plaintiff is a high school graduate and two (2) years of college.  *Id.* at 42, 73, 75, 105, 107, 264, 276.  Prior to her alleged disability, Plaintiff worked as a hospital billing clerk, receptionist, customer service representative, day care provider, and administrative assistant.  *Id.* at 32, 50–51, 264, 288–93, 308–315.

### 1.  Plaintiff's Testimony

#### a.  Administrative Hearing

At the administrative hearing, Plaintiff confirmed that she was fifty-three (53) years old and had attended some college.  AR at 42.  Plaintiff testified that she last worked on December 1, 2017, at Banner University Medical Center as a patient and customer service

---

Administrative Record ("AR") at 19, 225–26.  On April 18, 2018, SSA denied this application on initial review.  *Id.* at 19, 60–72, 143–46.  The Administrative Law Judge ("ALJ") observed that "[a]s the prior final denial can potentially be reopened for any reason, the undersigned is deciding the claimant's disability status since December 1, 2017, anew."  *Id.* at 19.

representative.  *Id.*  Plaintiff described the position as obtaining physicians' orders and coordinating preauthorization with the insurance company.  *Id.*  Plaintiff indicated that she left the position after she contracted Valley Fever.  *Id.* at 42–44.  Plaintiff further testified that her Valley Fever is currently controlled, but she has COPD—shortness of breath and coughing—as a result of the infection.  *Id.* at 44.

Plaintiff testified that she remains unable to return to work due to prior carpal tunnel surgeries, as well as lower back surgery.  AR at 44.  Plaintiff indicated that she was still dealing with therapy for her hands due to the surgery, and she just had lower back surgery and remains unable to sit or stand for any length of time.  *Id.*  Plaintiff also noted that she was going to need another back surgery for her left side.  *Id.*  Plaintiff further testified that after her Valley Fever resolved, she had a breast cancer recurrence.  *Id.*  Plaintiff stated that all of these things, one after another, resulted in her inability to return to work.  *Id.*

Plaintiff testified that she lives alone in an apartment.  AR at 44–45.  Plaintiff explained that her son had lived with her, but had recently passed away, so her nephew was coming from New York to care for her.  *Id.* at 44–45.  Plaintiff also indicated that her next door neighbor helped her when she did not have family in town.  *Id.* at 45.  Plaintiff confirmed that she could drive, but indicated she had not been out to do her own grocery shopping because she cannot carry them.  *Id.*

Plaintiff testified that she did not have another back surgery scheduled, because the insurance company required her to do physical therapy first.  *Id.*  Plaintiff reported that she had begun aquatic physical therapy the previous day.  AR at 45–46.  Plaintiff further explained that until she has some type of physical therapy, her insurance would not approve Magnetic Resonance Imaging ("MRI") either.  *Id.* at 46.  Plaintiff clarified that her doctor told her that if the therapy is too painful, to contact him and they could tell the insurer.  *Id.* at 46–47.  Plaintiff confirmed that she had post-surgical MRIs, but the doctors could not figure out what was wrong with her left side.  *Id.* at 49.  Her original surgery was because of pain radiating down her right leg, but the pain on her left side developed after surgery.  *Id.* at 49–50. Plaintiff explained that the post-surgical MRI caused her to surpass her annual

quota, which is why the insurance company requires physical therapy prior to further imaging studies.  AR at 49.

Plaintiff estimated that she could walk for five (5) to seven (7) minutes before feeling "serious" pain and weakness.  *Id.* at 47.  Plaintiff further testified that "laying down is just the worst."  *Id.*  Plaintiff explained that she alternates sitting, standing, and walking in an attempt to keep the pain to a minimum.  *Id.*  Plaintiff noted that for appointments, her family drops her off at the entrance to minimize the distance she needs to walk.  *Id.*  Plaintiff also testified that she had been sleeping on her right side, which she had recently had surgery on and despite instructions against it, because laying on her left side is so painful.  AR at 47.  Plaintiff estimated that she can lift and carry between three (3) and five (5) pounds.  *Id.*  Plaintiff testified that using a computer has been difficult due to her hand surgery, and indicated that she "can peck on a keyboard" but cannot type for any length of time.  *Id.* at 47–48.  Plaintiff further testified that she had trigger release surgery in December of 2018, and a trigger release surgery on her right thumb and index finger, as well as carpal tunnel surgery on the left in May of 2019.  *Id.* at 48–49.  Plaintiff confirmed that the trigger release of her right thumb and index finger was a success; however, opined that the trigger release on the left was not.  *Id.* at 50.  Plaintiff testified that her surgeon "wants [her] in physical therapy, but I can't do two[,] [a]nd right now my back is more important to me than the hand right now."  AR at 50.

In describing what would be the most difficult part of the pre-authorizations and billing position at Banner University Medical Center, Plaintiff testified as follows:

> That job, sitting for long periods of time and keyboarding.  A lot of keyboarding, lot of repetitive work.  And that's the work that I can't do anymore as far as my hands.  I wouldn't want to put myself in a keyboarding position, because – although he just did carpal tunnel surgery, I've done work and I've been in this career, administrative career, over 17 years in higher education at Cornell University.  And I've had carpal tunnel releases before.
>
> So[,] with this last one, I know that it's, like, I'm using – my hands are not as strong and I'm not able to use them like I was before.  Because, again, this is the second time on both hands to have surgery.  So it's just the repetitive typing, the sitting for long periods of time, I just – I can't do that.

*Id.* at 50–51.  Plaintiff described all of her past work involving "a lot of keyboarding, typing, repetitive work, a lot of sitting." *Id.* at 51.  Plaintiff estimated that even in a more comfortable type of office chair, she would only be able to sit for approximately ten (10) minutes before needing to get up and move around.  *Id.*  Plaintiff further testified that she is unable to sit in the car long enough to travel out of Tucson. *Id.* at 52–53.

### b. Administrative Forms

#### i.   *Exertional Daily Activities Questionnaire*

In March 12, 2018, Plaintiff completed an Exertional Daily Activities Questionnaire.  AR at 270–73.  Plaintiff reported that she lived alone in an apartment.  *Id.* at 270.  Plaintiff described her average day as follows:

> Shower, dress myself, make my bed, fix my meals, let my dog in and out to a gated backyard, lots of naps, sit with feet and legs elevated, walk approx. 100 ft., to mailbox (not daily), take medicine on time, and I lay down a lot.

*Id.* at 270.  Plaintiff indicated that due to the severity of the pain in her left hip, she takes medication that causes "tiredness and fatigue," as well as anti-fungal medication that causes a rash and raw, itchy skin.  *Id.*  Plaintiff noted that after brief activity she experiences shortness of breath and coughing.  *Id.*  Plaintiff reported that she has bouts of nausea and her appetite is affected, as well as edema in her feet and legs which require elevation.  AR at 270.

Plaintiff estimated that she walks approximately 100 feet to her mailbox, and to go there and back takes her approximately eight (8) minutes.  *Id.*  Plaintiff indicated that she can lift and carry a gallon of milk, her purse, sixty-four (64) ounces of laundry detergent, and a ten (10) pound bag of dog food.  *Id.* at 271.  Plaintiff reported that she does do her own grocery shopping, but "only if I need to grab something[,]" her son and his girlfriend do "actual grocery shopping."  *Id.*  Plaintiff further reported that she does her own household chores, including cooking and preparing her own meals, laundry, vacuuming, and mopping.  *Id.*  Plaintiff indicated that she has difficulty cleaning the bathtub and "[p]utting on bottoms, socks, and shoes[.]"  AR at 271.  Plaintiff further indicated that she drives to her doctor's appointments, the labs, and grocery store, "all within a 10 mile radius

of [her] home." *Id.* Plaintiff noted that she does these activities at least once per week. *Id.* Plaintiff described being able to complete chores, go on walks, and go to the mall prior to her illness. *Id.* Plaintiff indicated that now she becomes short of breath, body aches, swelling of her feet and legs, and severe hip pain. *Id.*

Plaintiff estimated sleeping approximately six (6) hours per night and including naps. AR at 271. Plaintiff indicated that she rests for at least an hour, once or twice per day. *Id.* Plaintiff's medications included acetaminophen, benzonatate, cetirizine, codeine-guaifenesin, fluconazole, ibuprofen, lidocaine topical, magnesium aspartate, tramadol, and trazodone. *Id.* at 272. Plaintiff reported that she wears glasses to correct her near-sightedness. *Id.* at 273. Plaintiff concluded her function report, as follows:

> Every day is different. I have some good days and some bad days. Taking it 1-day at a time, but my joint and hips hurt all the time. I'm learning how to deal with the pain and trying to be more active by trying to do things on my own.

*Id.*

### ii.    *Work History Reports*

Plaintiff completed an undated Work History Report. AR at 288–98. Plaintiff listed her past work to include administrative assistant, customer service representative, day care provider, patient financial services representative, and receptionist. *Id.* at 288. Plaintiff described each position as full time and reported her pay rate; however, she did not provide any additional information. *Id.* at 289–93.

On March 13, 2019, Plaintiff completed a second Work History Report. *Id.* at 308–315. Plaintiff listed her prior work to include administrative assistant, telemarketer, cashier, day care provider, executive administrative assistant, receptionist, customer service representative II, and patient service representative. *Id.* at 308. Plaintiff described the position of administrative assistant as fulltime—eight (8) or more hours per day, five (5) days per week—and included providing administrative and secretarial support to the Director and Associate Director of Multicultural Affairs, assisting in the preparation, monitoring, and reconciliation of the departmental and programming budgets, assimilating

data and preparing reports, preparing correspondence, coordinating and ensuring appropriate administrative support, and maintaining files.  AR at 309.  Plaintiff reported that the job required her to use machines, tools, or equipment; technical knowledge or skills; and to write, complete reports, or perform similar duties.  *Id.*  Plaintiff further reported that while working, she wrote, typed, or handled small objects for approximately forty (40) percent of her time or three (3) hours per day; sat for approximately sixty (60) percent of her time or four and one half (4 1/2) hours per day; and walked or stood for approximately twenty (20) percent of her time or two and one half (2 1/2) hours per day.  *Id.*  Plaintiff also reported that while working she would frequently lift  ten (10) pounds, and fifty (50) pounds was the heaviest weight she lifted.  *Id.*  Plaintiff noted she would lift and carry items such as supplies and copier paper.  *Id.*  Plaintiff did not supervise others and was not a lead worker.  AR at 309.

Plaintiff described the telemarketer position as fulltime—eight (8) hours per day, five (5) days per week—and included making calls to specific groups regarding research questionnaires.  *Id.* at 310.  Plaintiff reported that the position required her to use machine, tools, or equipment, as well as technical knowledge or skills, she did not write, complete reports, perform similar duties.  *Id.*  Plaintiff further reported that while working she sat for seven and one half (7 1/2) hours per day; wrote, typed, or handled small objects for three (3) hours per day; and walked or stood for one (1) hour per day.  *Id.*  Plaintiff also reported that she would frequently lift less than ten (10) pounds, and noted this was also the heaviest weight she lifted.  *Id.*  Plaintiff indicated that she did not supervise other people, was not a lead worker, and did not hire or fire employees.  AR at 310.

Plaintiff described the position of cashier as parttime—four (4) to five (5) hours per day, four (4) days per week—and included efficiently and accurately completing sales and service transactions at a front counter, keeping dining area clean, and supplies stocked.  *Id.* at 311.  Plaintiff reported using machines, tools, or equipment, but did not use technical knowledge or skills or write, complete reports, or perform similar duties in this position. *Id.*  Plaintiff further reported that she stood for four (4) hours per day; wrote, typed, or

handled small objects for three (3) hours per day; and walked for two (2) hours per day. *Id.* Plaintiff also reported that she frequently lifted ten (10) pounds, and this was also the heaviest weight that she lifted. *Id.* Plaintiff noted that the items she carried included supplies for restocking and bulk sized food prep bags. AR at 311. Plaintiff indicated that she was not a supervisor or a lead worker. *Id.*

Plaintiff described the position of daycare provider as fulltime—six (6) hours per day, five (5) days per week—and included providing supervision to one (1) infant and two (2) toddlers. *Id.* at 312. Plaintiff reported using machines, tools, or equipment, but did not use technical knowledge or skills or write, complete reports, or perform similar duties in this position. *Id.* Plaintiff further reported that she walked for five (5) hours per day; stood for three (3) hours per day; sat, kneeled, and crouched for two (2) hours per day; and wrote, typed, or handled small objects for one (1) hour per day. *Id.* Plaintiff also reported that she frequently lifted twenty-five (25) pounds, and this was also the heaviest weight that she lifted.[2] AR at 312. Plaintiff noted that she lifted and carried children. *Id.* Plaintiff indicated that she was a supervisor and a lead worker, but did not hire and fire employees. *Id.*

Plaintiff described the position of executive administrative assistant as fulltime—eight (8) hours per day, five (5) days per week—and included handling accounts payable, maintaining a calendar, making appointments, travel arrangements, answering phone, maintaining files, compiling and composing reports and correspondence, reconciling checking accounts, and answering inquiries from external organizations and vendors. *Id.* at 313. Plaintiff reported using machines, tools, or equipment, technical knowledge or skills, and writing, completing reports, or performing similar duties in this position. *Id.* Plaintiff further reported that she sat and wrote, typed, or handled small objects for seven (7) hours per day; stood for three (3) hours per day; walked for two (2) hours per day; and crouched for one (1) hour per day. AR at 313. Plaintiff also reported that she frequently

---

[2] Plaintiff checked the line indicating twenty (20) pounds was the heaviest weight lifted, which conflicts with the check indicating she lifted twenty-five pounds frequently.

lifted less than (10) pounds, and the heaviest weight that she lifted was twenty (20) pounds. *Id*. Plaintiff noted that she lifted and carried office supplies and copy paper. *Id*. Plaintiff indicated that she was neither a supervisor nor a lead worker. *Id*.

Plaintiff described the position of receptionist as fulltime—eight (8) hours per day, five (5) days per week—and included responsibility for all incoming calls; greeting customers, visitors, and vendors; maintaining office supplies, files, packing slips, and paid invoices; mailing statements; handling inquiries and requests; and maintaining customer accounts. *Id*. at 314. Plaintiff reported using machines, tools, or equipment, technical knowledge or skills, and writing, completing reports, or performing similar duties in this position. AR at 314. Plaintiff further reported that she sat, wrote, typed, or handled small objects for seven (7) hours per day; walked for two (2) hours per day; and stood for one (1) hour per day. *Id*. Plaintiff also reported that she frequently lifted less than ten (10) pounds, and the heaviest weight that she lifted was twenty (20) pounds. *Id*. Plaintiff noted that she lifted and carried office supplies, copier paper, and electrical parts and supplies. *Id*. Plaintiff indicated that she was not a supervisor or a lead worker. *Id*.

Plaintiff described the position of customer service representative II as fulltime—eight (8) hours per day, five (5) days per week—and included handling inbound telephone calls; assisting customers with refills, status updates, and insurance issues; and assisting members in benefits, eligibility, and account management. AR at 315. Plaintiff reported using machines, tools, or equipment, as well as technical knowledge or skills, but did not write, complete reports, or perform similar duties in this position. *Id*. Plaintiff further reported that she sat and wrote, typed, or handled small objects for seven (7) hours per day; and walked for two (2) hours per day. *Id*. Plaintiff also reported that she did not perform any lifting or supervising, and was not a lead worker. *Id*.

Plaintiff described the position of patient service representative as fulltime—eight (8) hours per day, five (5) days per week—and included handling large volumes of calls from insurance companies, patients, and providers regarding billing and payment issues. *Id*. Plaintiff reported that she sat for eight (8) hours per day; wrote, typed, or handled small

objects for seven and a half (7 1/2) hours per day; and walked for two (2) hours per day. AR at 315.  Plaintiff also reported that she did not lift anything and was not a supervisor or a lead worker.  *Id.*

### iii.   *Function Report—Adult*

On March 12, 2019, Plaintiff completed a Function Report—Adult.  AR at 299–307.  Plaintiff reported that she lived alone in an apartment.  *Id.* at 299.  Plaintiff outlined the limitations of her medical conditions as follows:

> Due to lower back and hip pain, my activities are very limited.  I experience shortness of breath even with walking.  I am always fatigued and don't get much sleep.  I'm also left-handed and due to severe carpal tunnel and my recent trigger finger surgery, this makes things more complicated.  My depression and anxiety have also gotten much worse, with more frequent episodes.

*Id.*  Plaintiff described her usual day to include showering, getting dressed, making her bed, preparing breakfast, and letting her dog in and out during the day.  *Id.* at 300.  Plaintiff indicated that her average day also includes taking her medications on time, walking approximately 100 feet to the mailbox, taking frequent naps throughout the day, and driving herself to doctors' appointments.  *Id.*  Plaintiff reported that she does not care for any other people, but does take care of her small dog.  AR at 300.  Plaintiff further reported that she is able to give her dog food and water, as well as let it in and out of the backyard, without assistance.  *Id.*

Plaintiff stated that prior to the onset of her condition she was able to work and complete chores without pain, anxiety, and fatigue.  *Id.*  Plaintiff indicated that lower back pain, pain in her left arm and hand, and anxiety affect her sleep.  *Id.*  Plaintiff reported that her condition affects her ability to bend to put on bottoms, socks, and shoes.  *Id.* at 301.  Plaintiff further indicated that she showers instead of bathing in a tub due to mobility issues; has difficulty keeping her arms raised over her head to care for her hair; has hair loss; and she avoids preparing meals that require a lot of standing.  AR at 301.  Plaintiff noted that she does not require reminders for personal care or taking medications.  *Id.*  Plaintiff reported that she prepares her own meals every day, and these include frozen

meals, sandwiches, salads, and slow cooker meals.  *Id.*  Plaintiff explained that she usually prepares meals that do not require a lot of preparation time, attention, or standing.  *Id.*  Plaintiff described her current household chores to include preparing her own meals, doing laundry, sweeping and mopping the floors, and vacuuming her throw rugs.  *Id.*  Plaintiff estimated that she performed these tasks for less than two hours each day.  AR at 302.  Plaintiff reported that she does not need help or encouragement to do these tasks, and noted that she is not responsible for the area outside of her apartment.  *Id.*

Plaintiff indicated that she goes out daily, is able to go out alone, and can drive a car.  *Id.*  Plaintiff noted that she avoids driving if it is contraindicated by her medication.  *Id.*  Plaintiff reported that she shops in stores, "mostly [for] staples and small items."  *Id.*  Plaintiff estimated that she shops twice per month for less than a half hour.  AR at 302.  Plaintiff confirmed that she is able to pay bills, count change, handle a savings account, and use a checkbook/money orders.[3]  *Id.* at 303.  Plaintiff listed her hobbies as reading, watching television, and taking scenic short drives.  *Id.*  Plaintiff noted that she reads and watches television daily, but takes drives and has anxiety episodes weekly.  *Id.*  Plaintiff reported that prior to the onset of her conditions she "was never a couch potato, or experienced daily anxiety episodes."  *Id.*  Plaintiff confirmed that she spends time with others, and described these interactions to include watching movies or sitting and visiting.  AR at 303.  Plaintiff indicated that these visits occur once per week.  *Id.*  Plaintiff further reported that she attends church every Sunday and does not need reminding or accompaniment.  *Id.*  Plaintiff explained that her anxiety and pain sometimes cause her to lash out, which results in difficulty getting along with others.  *Id.* at 304.

Plaintiff noted that her conditions affect her ability to lift, squat, bend, stand, walk, sit, kneel, climb stairs, complete tasks, use her hands, and get along with others.  *Id.*  Plaintiff reported that she can walk for approximately ten (10) minutes before needing to stop and rest, and her recovery time varies.  AR at 304.  Plaintiff reported that she is able to pay attention for an hour, but does not finish what she starts.  *Id.*  Plaintiff further

---

[3] Plaintiff noted that paying bills is difficult due to her current financial situation.

reported that she is able to follow written and spoken instructions. *Id.* Plaintiff indicated that she is able to get along with authority figures and has never lost a job because of an inability to get along with others. *Id.* Plaintiff also reported that she does not handle stress or changes in routine well. *Id.* Plaintiff expressed a fear of being homeless and ill. AR at 305. Plaintiff further indicated that she uses a cane, brace/splint and glasses, all of which have been prescribed. *Id.* Plaintiff's current medications included tramadol and gabapentin. *Id.* at 306.

On May 23, 2019, Plaintiff completed a second Function Report—Adult. *Id.* at 335–43. Plaintiff indicated that she lived alone in an apartment. *Id.* at 335. Plaintiff described the limitations of her medical conditions as follows:

> Carpal tunnel in both hands and trigger in both hands make it difficult to grasp, carry, and hold objects. Back pain makes it difficult to sit and stand for extended periods of time.

AR at 335. Plaintiff described her usual day to include showering, getting dressed, napping, watching television, attending appointments, eating, and walking to and from the mailbox. *Id.* at 336. Plaintiff denied caring for any other people, but reported caring for a pet whom she feeds, waters, and lets outside. *Id.* Plaintiff indicated that she does not have assistance caring for her pet. *Id.* Plaintiff reported that prior to her conditions, she "could do everything–work, social activities, hobbies, and interests." *Id.* Plaintiff noted that her conditions cause difficulty sleeping due to back pain. AR at 336.

Plaintiff reported difficulties with personal care including bending over to put on and tying her shoes; pulling herself out of the bath due to back pain; washing her hair due to carpal tunnel and trigger finger; holding a razor after hand surgery; and holding utensils due to trigger finger and carpal tunnel. *Id.* at 337. Plaintiff indicated that she did not need reminders to take care of her personal hygiene; however, she uses a medicine container with an alarm to remind her to take her medications. *Id.*

Plaintiff confirmed that she prepares simple meals, such as microwave meals, every day, and it takes her fifteen (15) minutes or less. *Id.* Plaintiff observed that she "used to

make full-course meals." *Id.*  Plaintiff reported that she vacuums with a light cordless vacuum for approximately ten (10) minutes a few times per week.  AR at 338.  Plaintiff denies being able to do other chores, noting that her cousin does the dishes, sweeps, mops, and takes out the garbage.  *Id.*

Plaintiff reported that she goes out once a week for appointments and can drive a car without accompaniment.  *Id.*  Plaintiff further reported that she shops in stores for food and personal supplies.  *Id.*  Plaintiff noted that her family helps with groceries, and that she shops once per month, using an app, and it takes her approximately thirty (30) minutes.  *Id.*  Plaintiff confirmed that she is able to pay bills, count change, handle a savings account, and use a checkbook/money orders.  AR at 339.

Plaintiff listed reading, sewing, and drives in the country as her hobbies.  *Id.*  Plaintiff noted that she takes drives once a month on the weekends, reads daily, and does not sew at all anymore.  *Id.*  Plaintiff described herself as an outdoor lover, who went hiking and driving up the mountains, prior to her conditions.  *Id.*  Plaintiff confirmed that she spends time with others on the telephone or visiting in person.  *Id.*  Plaintiff reported talking to friends on the telephone daily, and visiting in person a few times per week.  AR at 339.  Plaintiff also reported going to church every Sunday, but noted that she needs reminders to go places and someone to accompany her.  *Id.*  Plaintiff indicated that it was difficult to go out with friends.  *Id.* at 340.

Plaintiff described her conditions as affecting her ability to lift, squat, bend, stand, reach, walk, sit, kneel, and use her hands.  *Id.*  Plaintiff reported that she could walk for between ten (10) and fifteen (15) minutes before need to stop and rest.  *Id.*  Plaintiff estimated that after five (5) to ten (10) minutes of resting, she would be able to resume walking.  AR at 340.  Plaintiff denied having any problems paying attention, confirmed that she is able to finish what she starts, and indicated that she is able to follow written and spoken instructions.  *Id.*  Plaintiff noted that she does not have interactions with authority figures, and has never lost a job because of an inability to get along with others.  *Id.* at 341.  Plaintiff reported that she handles stress well, but does not handle changes in routine well

because it causes anxiety.  *Id.*  Plaintiff further reported that she does not want to be around people anymore.  *Id.*

Plaintiff also reported that she uses a cane, a brace/splint, and eyeglasses, all of which were prescribed.  AR at 341.  Plaintiff described using the cane for her "unsteady gait," sleeping with her wrist braces, as well as using them during the day while driving, and wearing glasses to correct her vision.  *Id.*  Plaintiff listed medications that included duloxetine for drowsiness and "combination" for nausea.  *Id.* at 342.  The remarks section indicated that her attorney's assistant completed the form with her because she was unable to use the pen to write, and she does not have someone to complete the Third Party Function Report.  *Id.*

### 2.  Plaintiff's Medical Records

#### a.  Treatment records[4]

On March 2, 2018, Plaintiff saw Michael S. Dahip, M.D. for an urgent visit regarding coughing, fevers, and left hip pain.  AR at 648–52.  Plaintiff described her hip pain as "feel[ing] like I dislocated my hip."  *Id.* at 648.  Plaintiff reported that the pain was consistent throughout the day and aggravated by movement, weight bearing, and external rotation or flexion at the hip."  *Id.*  Regarding Plaintiff's hip pain, Dr. Dahip noted "[n]o known inciting event or trauma but [Plaintiff was] unable to perform straight leg test due to pain."  *Id.* at 650.  Dr. Dahip began Plaintiff on a trial of Tramadol.  *Id.*

On June 13, 2018, Plaintiff was seen at Body Central Physical Therapy for low back and hip pain.  AR at 768–75.  Plaintiff complained of low back and hip pain radiating to the groin with walking, standing, transitional movement and sitting.  *Id.* at 770.  Plaintiff further reported that her left hip was worse than her right, and she has leg weakness.  *Id.*  Plaintiff "present[ed] with limited lumbar and hip mobility, weakness of the core, glutes and quads, decreased flexibility, impaired balance and gait and as a result decreased

---

[4] Although the Court has reviewed the entirety of Plaintiff's medical records, its summary is generally limited to records regarding Plaintiff's degenerative disc disease and carpal tunnel treatment.

function." *Id.* at 774.  On June 21, 2018, Plaintiff reported to her physical therapist that she had a lot of hip and back pain the previous day, and although the pain was decreased, she was having weakness.  *Id.* at 766.  Treatment records indicate significant tension in Plaintiff's left hip adductors proximally, iliotibial band, glutes, and piriformis.  AR at 766.  Plaintiff could only tolerate gentle treatment.  *Id.*  On June 25, 2018, Plaintiff reported to her physical therapist that she had fallen the previous day walking her dog.  *Id.* at 764.  Plaintiff showed increased pain and weakness, and had difficulty completing her exercises.  *Id.*  On June 28, 2018, Plaintiff reported soreness, without significant change in her groin pain to her physical therapist.  *Id.* at 762.  Treatment records indicated some decreased restrictions and increased strength in her legs and hips, but continued restriction and tenderness in her left hip adductors.  AR at 762.

On July 11, 2018, Plaintiff reported to her physical therapist that she had been sick the previous week, but reported an overall reduction in her pain levels.  *Id.* at 760.  Treatment records indicated Plaintiff showed improved left hip mobility and increased strength in her "glutes and quad."  *Id.*  On July 13, 2018, Plaintiff returned to physical therapy, and "report[ed] that she is overall feeling better since starting [physical therapy] but [] has been having [low back pain] with transitional movement."  *Id.* at 738.  Treatment records indicated that Plaintiff "tolerated manual [traction] and [dry needling] without exacerbation of [symptoms]."  *Id.*  Treatment records further indication limitations due to weakness and a limited range of motion.  *Id.*  On July 18, 2018, Plaintiff again returned to physical therapy.  AR at 740.  Plaintiff reported lower pain levels and showed improved hip mobility and "increased strength of the glutes and quad."  *Id.*  Treatment notes indicate that despite compliance with point of care and home exercise program, Plaintiff continued to show weakness and hip pain.  *Id.*  At her July 20, 2018, physical therapy appointment, Plaintiff reported "her symptoms are off an[d] on."  *Id.* at 736.  Treatment records indicated that Plaintiff "presented with increased restrictions along right lumbosacral musculature[,]" but did not have any adverse reactions to treatment.  *Id.*  On July 27, 2018, Plaintiff reported

"continued pain in left low back/hip but also has pain groin on the right" to her physical therapist. AR at 734. Records indicate that she tolerated exercise well. *Id.*

On August 1, 2018, Plaintiff reported to her physical therapist that "she ha[d] been rolling the inside of her thighs and so the groin has been feeling better[,] . . . [but] continues to have pain in left low back and hip." *Id.* at 732. Treatment records that "[s]he tolerated exercises well without increase in symptoms." *Id.* On August 8, 2018, Plaintiff expressed concern that she had broken her big toe after a chair fell on her, but reported her hip was feeling better overall. *Id.* at 730. Plaintiff "tolerated manual [traction] and [dry needling] well and without pain." AR at 730. Treatment records also reflected that "[s]he tolerated exercises well and overall present[ed] with improved glute and core strength." *Id.* On August 15, 2018, Plaintiff reported doing better overall but experienced increased soreness and tightness in her back after running for shelter the previous week. *Id.* at 753, 757. Treatment records indicate that her imaging came back negative. *Id.* Records further reflected overall improvement since the start of physical therapy. *Id.* at 755, 757. On August 22, 2018, Plaintiff reported that her low back felt better, but her left hip and buttock were sore. AR at 751. Treatment records indicated tightness with radiating symptoms on the left piriformis, but Plaintiff tolerated manual traction and dry needling well and was able to complete exercises afterwards without exacerbating her symptoms. *Id.*

On September 5, 2018, Plaintiff reported being "really sore today after going up to [M]ount Lemmon and d[oing] some hiking." *Id.* at 749. Physical therapy records indicate that Plaintiff tolerated treatment well and showed improved hip mobility, as well as core and glute strength, but complained of limitations due to pain. *Id.* On September 17, 2018, Plaintiff reported to her physical therapist that her left hip and low back "continue[d] to hurt but overall her [symptoms] are lower since starting [physical therapy]." *Id.* at 743. Plaintiff further reported seeing a neurologist. AR at 743. Treatment records indicated that Plaintiff tolerated exercises well, and posited her pain, weakness, and increased tightness of her lumbosacral spine may be due to her Valley Fever. *Id.* On September 18, 2018, Plaintiff saw Elizabeth Connick, M.D. for a follow up regarding her Valley Fever.

*Id.* at 592–94.  Dr. Connick noted that Plaintiff developed hip pain in January 2018, "but imaging did not reveal lesions to suggest cocci involvement" and no cause was determined. *Id.* at 592.  Dr. Connick opined that "the joint pains that she is experiencing in her index fingers . . . do not represent active disease but the sequelae of disease." *Id.* at 593.

On October 15, 2018, Plaintiff underwent magnetic resonance imaging ("MRI") of her spine.  AR at 487–88, 505–506.  Blair A. Winegar, M.D. reported "[s]evere bilateral L5-S1 facet arthrosis with associated grade 1 anterolisthesis of L5 on S1 contributing to mild spinal canal stenosis, severe bilateral subarticular recess narrowing, and severe bilateral neural foraminal narrowing[;] . . . bilateral L5-S1 facet joint effusions[;] . . . [and] [n]o abnormal contrast enhancement or marrow signal abnormality to suggest metastatic disease or infection[.]" *Id.* at 487, 506.  Dr. Winegar's findings indicated that "[t]here [wa]s severe bilateral L5-S1 facet arthrosis with associated joint effusions and a grade 1 anterolisthesis of L5 on S1[,]" but were otherwise unremarkable.  *Id.* at 488, 505.

On December 4, 2018, Plaintiff returned to Dr. Connick for a follow up regarding her Valley Fever.  *Id.* at 589–91.  Dr. Connick noted that Plaintiff "is greatly improved, particularly in terms of her fatigue, and feels that she could go back to work now."  *Id.* at 590.  Dr. Connick opined that this "would be good for her."  AR at 590.  Dr. Connick also noted Plaintiff's "ongoing pulmonary issues, back pain, and nausea and vomiting of unclear etiology" that were being evaluated by Plaintiff's other physicians.  *Id.*  On December 18, 2018, Gregory L. DeSilva, M.D. performed a trigger finger release and mass excision of Plaintiff's left thumb.  *Id.* at 614–15.  The surgery was unremarkable and mass benign.  *Id.*

On January 16, 2019, Plaintiff saw Helen Chan, M.D. at the Pain Institute of Southern Arizona to establish care.  *Id.* at 445–52, 461–68, 471–75.  Plaintiff reported pain in her "lower back and radiates down hips, and legs bilaterally (side)" that had been present for seven (7) to nine (9) months.  AR at 445, 461, 471.  Dr. Chan reviewed Plaintiff's history.  *Id.* at 445–47, 461–63.  Dr. Chan's review of Plaintiff's systems noted fatigue, achiness, fever, chills, cold feeling, muscle weakness, back pain, arthralgias, tingling,

numbness, and muscle tenderness. *Id.* at 447, 463. Dr. Chan's physical examination reported no acute distress, normal gait and station, but pain with palpation with bilateral L5-S1 lumbar facets and lumbar intervertebral spaces; pain in the lumbar spine in extension, as well as left and right lateral rotation; mild pain with palpation of the bilateral sacroiliac joints, with negative Patrick's test, bilateral piriformis muscles, and trochanteric bursae; and positive straight leg raising at 70 degrees bilaterally. *Id.* at 448, 464, 472. Dr. Chan assessed that Plaintiff's "pain is likely secondary to bilateral L5 radiculopathy, spinal stenosis, spondylosis and degenerative disc disease and myofascial pain." *Id.* at 450, 466, 473. Dr. Chan discussed possible steroid injections, after clearance from her infectious disease provider, prior to which she increased Plaintiff's gabapentin dosage and prescribed a muscle relaxant for breakthrough pain. AR at 450, 466, 473. Plaintiff was also directed to continue a home exercise plan. *Id.* at 450, 466, 474.

On January 24, 2019, Plaintiff underwent an electrodiagnostic consultation regarding bilateral hand numbness and carpal tunnel syndrome. *Id.* at 586–88. Plaintiff's nerve conduction velocity ("NCV") study demonstrated "[a]bnormal left median sensory and motor NCVs due to prolonged distal latencies." *Id.* at 586. Electromyography ("EMG") produced normal results in both arms. *Id.* at 586–87. Micah Etter, M.D. and Colin R. Bamford, M.D. concluded Plaintiff's results suggested moderate left carpal tunnel syndrome. AR at 587.

On February 13, 2019, Plaintiff was seen by Anthony M. Witten, D.O. for a follow-up regarding her carpal tunnel and tumor removal surgeries, as well as her spinal canal stenosis. *Id.* at 617–20. Dr. Witten reviewed Plaintiff's October 2018 MRI results and assessed that "[b]ilateral L5-S1 facet joint effusions and may be the result of abnormal motion or active inflammation in the setting of facet arthrosis." *Id.* at 618. Dr. Witten did not find any abnormalities suggestive of metastatic disease or infection. *Id.* Dr. Witten also noted the small benign tumor that was removed, as well Plaintiff's MRI results for her lower back and hip, and that Plaintiff was being followed by Orthopedic surgery and pain management. AR at 618–19. Dr. Witten reviewed Plaintiff's NCV and EMG

summaries, and indicated that she was being followed by Neurology. *Id.* at 619. Dr. Witten continued Plaintiff's Gabapentin prescription, increased her Tramadol, and directed that she continue physical therapy. *Id.*

On March 20, 2019, Plaintiff saw Dr. Dahip for a follow-up. *Id.* at 623–27. Dr. Dahip's review of Plaintiff's systems was positive for night sweats, fatigue, malaise, intermittent cough (stable), numbness, tingling, anxiety, and depression. *Id.* at 623. Dr. Dahip's physical examination was generally unremarkable, except for decreased grip strength in Plaintiff's hands, with her left worse than her right. AR at 623–24. Dr. Dahip did not change any of Plaintiff's pain medication as her "[c]urrent pain regimen [was] working best for her." *Id.* at 625.

On May 9, 2019, Plaintiff underwent left carpal tunnel release surgery and a trigger release of the right thumb and index fingers. *Id.* at 612–13. Dr. DeSilva performed the surgery, which was uneventful. *Id.* On May 30, 2019, Plaintiff returned to Dr. Dahip because she was concerned that her hands were not healing properly. *Id.* at 628–34. Dr. Dahip noted that Plaintiff had a significant amount of pain after hand surgery, which was complicated by a soft tissue infection. AR at 628. Plaintiff indicated that she had followed up with hand surgery and was put on Bactrim. *Id.* Plaintiff reported that her fingers are swollen but feel broken, and she is having difficulty opening jars. *Id.* Dr. Dahip indicated that radiographs showed no acute fractures, but that Plaintiff's fingers were swollen. *Id.* Dr. Dahip's review of Plaintiff's systems was unremarkable except for poor sleep, shortness of breath, and hand pain with drainage. *Id.* Dr. Dahip's physical examination of Plaintiff was similarly unremarkable, but he noted her "[r]ight hand with 2nd digit more edematous in comparison to left hand[;] [t]wo hyperkeratotic lesions on the palmar surface that appear to be healing[;] [l]eft hand palmar surface median tendon sheath site with hyperkeratotic lesion and minor fluctuance, no visible drainage at this time." AR at 629. Dr. Dahip directed Plaintiff to follow up with hand surgery again for post wound check, and if cleared to begin hand occupational therapy. *Id.*

1    On July 24, 2019, Plaintiff saw Dr. DeSilva for a follow-up regarding her surgeries.

2  *Id.* at 686–87.  Plaintiff "continue[d] to endorse severe pain over her left carpal tunnel

3  incision and left thenar eminence[,] . . . [and] endorses triggering of her right index finger

4  [distal interphalangeal] joint." *Id.* at 686.  Plaintiff reported that her primary care physician

5  expressed concern that something was wrong.  *Id.*  Dr. DeSilva's examination of Plaintiff's

6  right hand demonstrated well healed incisions over the A1 pulley of her index and thumb,

7  without signs of infection.  *Id.*  Plaintiff was "able to flex/extend thumb and index finger

8  without any triggering or catching." *Id.*  Dr. DeSilva's examination of Plaintiff's left hand

9  showed a well-healed incision over her carpal tunnel without signs of infection.  AR at 686.

10 Dr. DeSilva noted that Plaintiff was "extremely tender to light palpation over incision and

11 thenar eminence[,] [was] [a]ble to make a fist, but very weak[,] sensation intact to light

12 touch over [median/ulnar/radial] distribution." *Id.*  Plaintiff rated her pain at an eight (8).

13 *Id.*  Dr. DeSilva opined that Plaintiff's incisions looked "fantastic" without noticeable

14 triggering or catching.  AR at 687.  Dr. DeSilva reassured Plaintiff that "her course [wa]s

15 progressing as expected in terms of pain and numbness[,]" and referred her to hand therapy

16 for desensitization therapy for her continuing left hand pain.  *Id.*

17    On August 19, 2019, Plaintiff saw Rita Wadeea, M.D. for her annual physical

18 examination.  *Id.* at 678–80.  Plaintiff reported that she was still having pain at the site of

19 her left carpal tunnel surgery and some swelling and weakness.  *Id.* at 678.  Dr. Wadeea

20 noted that Plaintiff wore her splint but never worked with physical or occupational therapy.

21 *Id.*  Dr. Wadeea's review of Plaintiff's systems was unremarkable.  AR at 678.  Dr.

22 Wadeea's physical examination was similarly unremarkable, but noted "left wrist

23 tenderness at the site of carpal tunnel surgery, with slight weakness, motor 4/5, [and] lower

24 spine tenderness." *Id.* at 679.  Dr. Wadeea recommended that Plaintiff continue to wear

25 the splint, begin working with physical or occupational therapy, and consider a follow-up

26 with hand surgery if she did not see any improvement in two (2) weeks after physical

27 therapy. *Id.*

28

On September 25, 2019, Plaintiff returned to Dr. DeSilva for a follow-up.  *Id.* at 684–85.  Plaintiff reported that she had been working with a hand therapist, but continued to complain of left-hand pain.  *Id.* at 684.  Dr. DeSilva noted that "on further questioning she says that the carpal tunnel deep achiness has gotten better[,] . . . [and] is working with a hand therapist to improve sensation."  AR at 684.  Plaintiff reported difficulty grabbing things with the left hand, as well as low back pain.  *Id.*  Dr. DeSilva further noted that Plaintiff had an elastic stockinette on the left hand, when this was removed the carpal tunnel incision appeared well healed.  *Id.*  Dr. DeSilva reported that "[t]here is no erythema[,] . . . no fluctuance[,] . . . [Plaintiff] is tender with any motion of the thumb and withdraws the hand[,] [s]he is tender all over so [Dr. DeSilva] cannot tell if there is distinct pillar pain[,] [Plaintiff] has good digital range of motion[,] [n]o intrinsic wasting[,] . . . [n]o fasciculations are noted in the thenar area[,] [and] [t]he hand is pink warm and well perfused."  *Id.*  Dr. DeSilva opined that he had "tried to provide a lot of confidence and reassurance that [he] ha[s] been able to help with some but not all of her symptoms and that she is the most important person for looking at the positive outlook and adapting and finding what needs with her chronic pain issues."  *Id.*  Plaintiff "seem[ed] pleased that the carpal tunnel release has helped much of her symptoms."  AR at 684.

On November 18, 2019, Plaintiff had a new patient consult with Kurt A. Schroeder, M.D. regarding her low back pain which radiated down her right leg.  *Id.* at 708–709.  Dr. Schroeder reviewed Plaintiff's MRI from October 2018 that showed "she ha[d] a slip of L5 on S1."  *Id.* at 708.  Dr. Schroeder noted that "[t]he radiologist called it severe foraminal disease; I might call it moderate foraminal disease, but one can still see that the 5 roots still maintain their round shape and are not particularly flattened as you would see in severe stenosis, but [Plaintiff] has pain with sitting that goes down the right lower extremity, buttock, a little bit in the calf, though really not much beyond that."  *Id.*  Dr. Schroeder's physical examination was generally unremarkable, but indicated Plaintiff had pain when he pushed on the right sacroiliac joint.  *Id.*  Dr. Schroeder also noted that Plaintiff had gone

1    off of her fluconazole, which was treating her Valley Fever, without telling her infectious
2    disease specialist.  AR at 708.

3        On December 2, 2019, Plaintiff underwent nerve conduction studies for her back
4    and right leg pain.  *Id.* at 710–12.  Adam Reynolds, M.D. reported that her nerve conduction
5    studies were within normal limits; however, "[t]he needle exam of the right lower extremity
6    shows motor unit abnormalities in the tibialis anterior and extensor hallucis longus."  *Id.* at
7    710.  Dr. Reynolds interpreted these results as "compatible with possible mild, chronic,
8    right L5 radiculopathy."  *Id.*

9        On February 26, 2020, Plaintiff underwent an MRI of her lumbar spine.  *Id.* at 721–
10   22.  Nicholas Fraley, M.D. reported "[s]evere L5-S1 facet degeneration with L5
11   degenerative anterolisthesis and disc bulge[,] . . . [and] an increasing right paracentral
12   protrusion causing right lateral recess stenosis and some mass effect on descending right
13   L5 nerve root[,] [c]orrelate with right L5 radiculopathy."  AR at 722.  Dr. Fraley further
14   reported "[m]ild to moderate right sided dominant spinal stenosis[,] [and] [m]oderate
15   bilateral foraminal stenosis."  *Id.*  Dr. Fraley indicated that Plaintiff exhibited "[m]ild spinal
16   stenosis at L4-5 mostly due to posterior element degenerative changes and overgrowth[,]
17   [but] [n]o evidence of spinal infection."  *Id.*

18       On March 4, 2020, Plaintiff returned to Dr. DeSilva regarding continued pain after
19   surgery and concern that the procedure was not done correctly.  *Id.* at 681–82.  Plaintiff
20   reported that her hand will tremor on occasion, and she is unable to hold objects, often
21   dropping them due to weakness.  *Id.* at 681.  Dr. DeSilva noted "[t]enderness to palpation
22   of the right index PIP joint[,] [m]ild swelling[,] [w]eak fist, [u]nable to touch her index
23   finger to the [metacarpophalangeal] joint[,] [d]istal pulses 2+ radial bilaterally[,] [c]ap refill
24   regular in the rest of patient's right hand  as well as h[er] left hand[,] . . . no evidence of
25   triggering[,] . . . [n]o masses are palpable in the right index finger[,] . . . no abnormal
26   swelling[,] [flexor digitorum superficialis] and [flexor digitorum profundus] function intact
27   to right index finger."  AR at 681.  Dr. DeSilva referred Plaintiff "to hand therapy for hand
28   sensation and biofeedback."  *Id.*  Dr. DeSilva opined that her finger looked good without

evidence of triggering, and further surgical intervention was not required. *Id.* at 682. On March 20, 2020, Plaintiff returned to physical therapy for low back pain and right lower extremity radicular symptoms. *Id.* at 797–803. Treatment records indicate "decreased lumbar [active range of motion], dermatome changes in a non-dermatome pattern, decreased [bilateral lower extremity] strength, myotome changes mostly with [right] dorsiflexion and big toe extension, [positive] slump test on right, [positive straight leg raise] test on right starting at 20 degrees, pain with OP to L5 and S1, and increased paraspinal tightness especially on L." *Id.* at 797, 799, 802. On March 30, 2020, Plaintiff underwent physical therapy and reported that she had been hurting for a few days. AR at 795. Treatment records indicate that Plaintiff had "[g]ood tolerance to initial treatment session." *Id.* She also exhibited increased overall soreness, but no exacerbation was noted during manual therapy techniques and therapeutic exercises. *Id.*

On April 3, 2020, Plaintiff returned to physical therapy complaining of severe leg pain. *Id.* at 793–94. Treatment records noted that "[m]annual therapy [was] provided to centralize symptoms, decrease muscle spasms followed by ther[apeutic] ex[ercises] to improve core stabilization, decrease nerve pain." *Id.* at 793. On April 7, 2020, Plaintiff underwent imaging of her lumbar spine. AR at 723. Rajul Shah, M.D. reported that x-rays showed "[d]egenerative grade 2 anterolisthesis L5 on S1[,] [with] [n]o significant translation with weightbearing." *Id.* On April 8, 2020, Plaintiff returned to physical therapy. *Id.* at 791–92. Treatment records indicated that Plaintiff underwent therapeutic exercises, as well as manual therapy techniques. *Id.* at 791. Plaintiff also had "[g]ood tolerance with initial dry needling session . . . and [g]entle progression of core stabilization[.]" *Id.* Two days later, Plaintiff had another physical therapy appointment, and showed "[g]ood tolerance to initial trial of cupping[.]" AR at 789. She again received therapeutic exercises and manual therapy techniques, and reported feeling better. *Id.* at 789. On April 13, 2020, Plaintiff saw was seen by Kurt A. Schroeder, M.D. regarding her MRI. *Id.* at 706–707. Dr. Schroeder reported that Plaintiff had "a grade 2 slip of 5 on 1 that is nonmobile" and treated with one lumbar epidural steroid injection, as well as "some

localized blocks without any improvement in her back and lower extremity pain." *Id.* at 706. Dr. Schroeder further noted that on a follow-up MRI, Plaintiff had "a right 5-1 [herniated nucleus pulposus] that is severely narrowing her canal on that right-hand side secondary to the disc rupture." *Id.* Dr. Schroeder also noted that Plaintiff had "a little bit of foraminal disease[.]" AR at 706. Dr. Schroeder's physical examination of Plaintiff was unremarkable except for positive straight leg raising on right. *Id.* Dr. Schroeder and Plaintiff agreed that she would go forward with a right L5-S1 microdiscectomy. *Id.* On April 15, 2020, Plaintiff returned to physical therapy and performed therapeutic exercises followed by manual intervention. *Id.* at 787. Plaintiff also received instructions for a home exercise program. *Id.* On April 17, 2020, Plaintiff had another physical therapy session. AR at 785–86. Plaintiff reported "feeling much better since last session and addition of towel roll stretch/self-mob." *Id.* at 785. Plaintiff further reported continued mild to moderate pain mainly in the right buttock. *Id.* Plaintiff performed therapeutic exercises and received manual intervention. *Id.* Treatment records indicate that Plaintiff "[a]dded bridges today with good tolerance[,]" which was "a big improvement" as she had been unable to do bridges previously. *Id.* Records further indicated that Plaintiff did not have any pain during exercises. AR at 785. On April 22, 2020, Plaintiff returned to physical therapy and reported "minimal pain and numbness[.]" *Id.* at 783–84. Treatment records indicated that Plaintiff performed therapeutic exercises and received manual intervention, with her "[p]ain and tenderness still mainly in [her] [right] buttock." *Id.* at 783. Two days later, Plaintiff again reported "minimal pain and numbness" at physical therapy. *Id.* at 781. Treatment records indicate that Plaintiff was able to tolerate the bike "without increased pain reported." *Id.* On April 27, 2020, Plaintiff was seen by Dr. Schroeder regarding her right leg pain. AR at 704–705. Dr. Schroeder noted Plaintiff had "good strength and absent right ankle jerk[,] [and] [s]traight leg raising [wa]s positive on the right." *Id.* at 704. Plaintiff confirmed that she wanted to proceed with surgery. *Id.* Dr. Schroeder further noted that Plaintiff had "a grade 2 slip on 5 on 1 but she has, interestingly enough, not much foraminal disease on the right, a lot more on the left where she does not have any

1   pain so a simple microdiscectomy is contemplated and is what she has elected to do." *Id.*

2   Dr. Schroeder's review of Plaintiff's systems was unremarkable. *Id.*  On April 29, 2020,

3   Plaintiff returned to physical therapy and indicated that she was sore.  AR at 779–80.

4   Plaintiff performed therapeutic exercises and underwent manual therapy.  *Id.* at 779.

5   Treatment records indicated "[d]ecreased pain after towel roll exercise." *Id.*

6         On May 1, 2020, Plaintiff was discharged from physical therapy to have surgery.

7   *Id.* at 776.  On May 6, 2020, Plaintiff underwent a right-sided L5-S1 microdiscectomy and

8   dissection of the S1 root from hypertrophied soft tissue.  *Id.* at 716–17.  The surgery was

9   unremarkable.  AR at 716–17.  On May 18, 2020, Plaintiff saw Dr. Schroeder for a follow-

10  up one (1) week after her right L5-S1 resection of a herniated nucleus pulposus.  *Id.* at 702–

11  703.  Plaintiff reported that her "right leg [wa]s doing great but she has had a lot of . . .

12  excruciating left leg pain." *Id.* at 702.  Plaintiff reported that even Percocet did not manage

13  the pain.  *Id.*  Dr. Schroeder noted that Plaintiff had "good strength on both sides[,]

14  [s]traight leg raising [wa]s positive on the left, negative on the right[,] [s]he c[ould] toe

15  walk and heel walk[,] [and] [h]er incision look[ed] good." *Id.*  Dr. Schroeder opined that

16  Plaintiff "look[ed] like someone who maybe has ruptured a disc opposite the side of her

17  surgery." AR at 702.  Dr. Schroeder ordered an MRI of Plaintiff's lumbar spine and added

18  an anti-inflammatory medication.  *Id.*  Dr. Schroeder's review of Plaintiff's symptoms was

19  unremarkable.  *Id.*  On May 13, 2020, Plaintiff underwent imaging of her lumbar spine.  *Id.*

20  at 724–26.  Plaintiff's post-operative MRI showed a residual disc bulge with "mixed signal

21  intensity material in the right lateral recess which is largely enhancing but with a small

22  focus of central non-enhancement on the axial enhanced T1 sequences[,] . . . correlate with

23  any right S1 radiculopathy." *Id.* at 725.  Dr. Fraley observed that "[o]n the left, the findings

24  have slightly progressed from recent prior and the far lateral herniation is intimate with the

25  exiting left L5 nerve root[,] [c]orrelate with left L5 radiculopathy." AR at 725.  Dr. Fraley

26  indicated that this was a subtle change.  *Id.*  On x-ray, Dr. Fraley noted "[s]table 1.2 cm L5

27  anterolisthesis with associated advanced facet arthrosis and L5-S1 degenerative disc

28  disease." *Id.* at 726.  On May 15, 2020, Plaintiff underwent venous duplex imaging of her

left lower extremity.  *Id*.  Matthew Namanny, D.O. found "no evidence of acute deep or superficial vein thrombosis in [Plaintiff's] left lower extremity."  *Id.*  Dr. Namanny noted that this was a limited study due to Plaintiff's inability to tolerate probe pressure.  AR at 727.  On May 18, 2020, Plaintiff was seen by Kurt A. Schroeder, M.D. for an incision check.  *Id.* at 700–701.  Plaintiff reported her right leg pain was "totally gone."  *Id.* at 700.  Dr. Schroeder indicated that Plaintiff later developed left leg pain.  *Id.*  Dr. Schroeder reported Plaintiff deep vein thrombosis study ("DVT") "was clean" and her MRI looked "pretty clean."  *Id.*  Dr. Schroeder described Plaintiff's left leg pain as "down the whole leg" and "very positional."  AR at 700.  Dr. Schroeder noted that they had put Plaintiff on steroids, and after "three days, she started to have some drainage."  *Id.*  Dr. Schroeder stopped the steroids and started her on an antibiotic.  *Id.*  On May 20, 2020, Plaintiff returned to Dr. Schroeder for a post-operative follow-up.  *Id.* at 698–99.  Dr. Schroeder reported that Plaintiff's DVT study "was clean" and her post-operative MRI looked "good."  *Id.* at 698.  Dr. Schroeder further noted that Plaintiff still "has that anterolisthesis of 5 on 1."  AR at 698.  Dr. Schroeder also reported Plaintiff had good strength, negative straight leg raising, and that she could sit.  *Id.*  Dr. Schroeder described Plaintiff as smiling and joking a bit, although not completely back to normal.  *Id.*  Plaintiff indicated "that now it is not so much the pain, but she notices numbness in the lateral aspect of her left foot." *Id.*  Dr. Schroeder noted that Plaintiff's reflexes were "2+ at the knees and 2+ at both ankles with downgoing toes."  *Id.*  Dr. Schroeder's review of Plaintiff's systems was unremarkable.  AR at 698.  On May 27, 2020, Plaintiff returned to Dr. Schroeder for a post-operative follow-up.  *Id.* at 696–97.  Dr. Schroeder reported that Plaintiff had a skin staph infection that was sensitive to the Bactrim, "[h]er incision looks good[,] [t]here is no drainage[,] [t]he scab looks good[,] [s]he has normal strength, symmetric 2+ and even ankle jerks are 2+[,] [s]he had good strength in the dorsiflexors and plantar flexors[,] [s]traight leg raising is negative."  *Id.* at 696.  Dr. Schroeder described Plaintiff as smiling and joking. *Id.*  Dr. Schroeder further noted that "[t]he excruciating pain on the left side is gone[.]"  *Id.*  Dr. Schroeder instructed Plaintiff to "walk, walk, walk" and she indicated that she is out

1    taking car trips.   AR at 696.   Dr. Schroeder's review of Plaintiff's systems was

2    unremarkable.  *Id.*

3        On June 5, 2020, Plaintiff saw Dr. Schroeder for a follow-up regarding her

4    continued left leg pain.  *Id.* at 694–95.  Dr. Schroeder reported that after the operation for

5    Plaintiff's right leg pain, it did not return; however, "she developed left leg pain and also

6    she was on Bactrim for some skin staph that was growing there."  *Id.* at 694.  Plaintiff

7    reported increased pain down her left leg, which never gets to the top or bottom of the foot,

8    although her whole foot felt numb.  *Id.*  Dr. Schroeder's physical examination of Plaintiff

9    showed "normal strength in the left leg with only rachety, giveway, nonphysiologic

10   weakness, [s]traight leg raising is theatrically positive at 5 degrees[,] [t]he reflexes are

11   preserved at the knees at 2+ and 2+ at both ankles[,] [and] [t]he incision looks good."  AR

12   at 694.  Dr. Schroeder's review of Plaintiff's systems was unremarkable.  *Id.*  On June 9,

13   2020, Plaintiff underwent nerve conduction studies for her left leg pain.  *Id.* at 713–15.  Dr.

14   Reynolds observed that her nerve conduction studies in the left lower extremity were within

15   normal limits, but the needle exam showed abnormalities.  *Id.* at 713.  Dr. Reynolds found

16   it was an "[a]bnormal study with mild distal neurogenic changes[,] [and] [could not]

17   exclude left L5/S1 radiculopathy."  *Id.*

18       On July 17, 2020, Plaintiff was seen by Kurt A. Schroeder, M.D. for a follow-up.

19   AR at 692.  Dr. Schroeder reported that Plaintiff had a "total resolution" of the right leg

20   pain post-surgery.  *Id.*  Dr. Schroeder indicated that she began having left leg pain

21   approximately four (4) days postop.  *Id.*  Dr. Schroeder further reported that at her visit at

22   the end of May 2020, Plaintiff looked good, but then at the beginning of June, she was

23   having more left hip pain.  *Id.*  Dr. Schroeder reported that an EMG showed L5

24   radiculopathy without "much pressure on the 5 root."  *Id.*  Dr. Schroeder noted that "[h]er

25   incision looks perfect[,] [s]traight leg raising is negative[,] [s]he has good strength[,] [s]he

26   can toe walk and all of her L5 muscles are normally strong."  AR at 692.  Dr. Schroeder

27   further noted that insurance denied an additionally MRI and he recommended pool therapy.

28   *Id.*  Dr. Schroeder opined that Plaintiff looked a lot better, and reported feeling better than

on her previous visit.  *Id.*  Dr. Schroeder's review of Plaintiff's systems was unremarkable. *Id.*

### b.  Examining physician records—Justin S. Phelps, Ed.D.

On July 13, 2019, Plaintiff was seen by Justin S. Phelps, Ed.D. for a psychological evaluation upon referral from the Arizona Department of Economic Security ("AZDES"). AR at 662–66.  Dr. Phelps reviewed Plaintiff's medical records and history.  *Id.* at 662. Plaintiff reported that her "hand injury makes everything really hard."  *Id.* at 663.  Plaintiff indicated that she "used to be very productive" and no longer does "much of anything" in terms of socializing or entertainment.  *Id.*  Plaintiff further indicated that she was not working "[m]ostly because of Valley Fever . . . it got really bad."  *Id.* (ellipses in original). Dr. Phelps noted Plaintiff's medical conditions included neuropathy, asthma, severe sciatica, Valley Fever, carpal tunnel, spinal stenosis, chronic pain, and lower back pain. AR at 663.

Dr. Phelps administered the Folstein Mini-Mental Status Examination.  *Id.* at 664. Plaintiff achieved a score of 29 out of a possible 30 on the exam.  *Id.*  Dr. Phelps's observations were generally unremarkable, but noted Plaintiff had a poor grip and indicated decreased sleep.  *Id.* at 664–66.  Dr. Phelps observed that Plaintiff's "[d]epression appears to be mild to moderate in nature and chronic[,] . . . [and] amenable to therapy."  *Id.* at 666. Dr. Phelps further opined that Plaintiff's "[a]nxiety levels are situational and not diagnosable[,] . . . [and] [n]o other mood or thought disorders were present."  AR at 666.

Dr. Phelps completed a Psychological/Psychiatric Medical Source Statement regarding Plaintiff.  *Id.* at 667–68.  Dr. Phelps opined that although there was a current diagnosis, he did not expect it to last for twelve (12) continuous months.  *Id.* at 667.  Dr. Phelps further opined that Plaintiff was generally unlimited in the areas of understanding and memory; sustained concentration and persistence; social interaction; and adapting to change.  *Id.* at 667–68.  Dr. Phelps noted mild limitations in Plaintiff's overall abilities in work/life procedures; maintaining regular attendance; working with co-workers; and socialization.  *Id.* at 667.

### 3. **Vocational Expert Gretchen A. Bakkenson's Testimony**

Ms. Bakkenson testified as a vocational expert at the administrative hearing.  AR at 19, 53–58.  Ms. Bakkenson described Plaintiff's past relevant work in hospital billing, Dictionary of Occupational Titles ("DOT") number 214.482-010, as semi-skilled, having a Specific Vocational Preparation ("SVP") of 4, and exertional level of sedentary.  *Id.* at 53.  Ms. Bakkenson described the job of customer service representative, DOT number 219.387-014, as semi-skilled, having an SVP of 4, and sedentary exertional level.[5]  *Id.* at 54–55.  Ms. Bakkenson also described the receptionist position, DOT 237.367-038, semi-skilled, with an SVP of 4, and sedentary exertional level.  *Id.* at 53.  Ms. Bakkenson observed that Plaintiff described the receptionist position as sedentary to light.  *Id.*  Ms. Bakkenson also noted that Plaintiff worked as an administrative assistant, but did not meet an SVP.  AR at 54.

The ALJ asked Ms. Bakkenson to consider a hypothetical individual of Plaintiff's age, education, and work history, and who retains the residual functional capacity to perform a range of up to light work, but is limited to the occasional climbing of ramps and stairs; no ladders, ropes, or scaffolds; frequent balancing; and occasional stooping, kneeling, crouching, and crawling.  *Id.* at 55.  Ms. Bakkenson opined that such an individual could perform all the jobs that she had described.  *Id.*

The ALJ then asked about a second hypothetical individual of Plaintiff's age, education, and work history, and who is limited to a full range of sedentary work.  *Id.*  Ms. Bakkenson opined that such an individual would be able to perform all of the jobs that she had previously described.  *Id.*  The ALJ then added additional limitations to the second hypothetical individual, including that they could only sit for twenty (20) minutes before they would need to go from sitting to standing.  AR at 55–56.  Ms. Bakkenson opined that there would be no work for such an individual, because the individual would end up being off-task more than allowed.  *Id.* at 56.  Ms. Bakkenson further opined that if the individual

---

[5] Ms. Bakkenson initially described this position as telemarketing, but corrected it upon clarification by the Plaintiff.  AR at 53–55.

could sit for thirty (30) minutes before needing to stand up and stretch for a couple of minutes, then they would be able to maintain employment. *Id.* Ms. Bakkenson explained that the off-task limitation was no more than ten (10) percent. *Id.* at 56–57. Ms. Bakkenson confirmed that her knowledge regarding the sit/stand limitations was not from the DOT, but her own experience and her testimony was otherwise consistent with the DOT and Standard Occupational Classification ("SCO"). *Id.* at 57–58.

Upon questioning by Plaintiff's counsel, Ms. Bakkenson opined that Plaintiff's previous work involved frequent handling and fingering. AR at 57. Plaintiff's counsel further inquired about the second hypothetical individual, who could stand and walk for no more than ten (10) to fifteen (15) minutes at a time for a total of four (4) hours in the day or sit no more than ten (10) to fifteen (15) minutes at a time for a total of four (4) hours of the day; lift ten (10) pounds occasionally, and less than ten pounds frequently. *Id.* Ms. Bakkenson reiterated her opinion regarding the amount of time such an individual would be off-task and how that would preclude employment. *Id.* Plaintiff's counsel also asked about work availability for a hypothetical person at a full range of sedentary work with occasional handling and fingering. *Id.* Ms. Bakkenson opined that such an individual would not be able to perform Plaintiff's past work, and that there would not be any transferrable skills. *Id.* at 58.

### 4. Lay Witness Testimony—Meredith Reams

On March 14, 2019, Plaintiff's cousin, Meredith Reams, completed a Function Report—Adult—Third Party. AR at 316–23. Ms. Reams reported that she has known Plaintiff for eight (8) years and spends all between thirty (30) and 180 minutes a day, up to five (5) days per week helping with household chores. *Id.* at 316. Ms. Reams described Plaintiff's living situation as alone in an apartment. *Id.* Ms. Reams observed that Plaintiff is usually in a lot of pain and not feeling well when she visits. *Id.* Ms. Reams further reported that Plaintiff is often laying down resting, although she will push through her pain to do what she can. *Id.* Ms. Reams indicated that Plaintiff has a dog that she feeds and cares for. AR at 317. Ms. Reams described Plaintiff prior to her illness as someone who

worked and lived a normal self-supporting life. *Id.* Ms. Reams recalled that Plaintiff occasionally mentioned that she had not slept due to pain. *Id.* Ms. Reams noted that she will either ask or remind Plaintiff about her medication to ensure that she has taken it. *Id.* at 318.

Ms. Reams confirmed that Plaintiff can prepare her own meals, which include frozen meals, salads, microwavable vegetables, or other easily prepared meals. *Id.* Ms. Reams indicated that Plaintiff prepares meals daily, and it takes her approximately ten (10) to twenty (20) minutes. AR at 318. Ms. Reams observed that Plaintiff has to choose how and what she cooks because she cannot stand for long. *Id.* Ms. Reams reported that Plaintiff struggles to maintain her apartment, but does the dishes, floor, bathroom, and laundry. *Id.* Ms. Reams indicated that Plaintiff goes out daily depending on the weather. *Id.* at 319. Ms. Reams further reported that Plaintiff can drive a car and goes out alone. *Id.* Ms. Reams confirmed that Plaintiff can shop in stores for food, household items/necessities, and dog food, and does so every other week. AR at 319. Ms. Reams reported that Plaintiff can count change, handle a savings account, and use a checkbook/money orders, but cannot pay bills because she had not been able to work. *Id.*

Ms. Reams listed Plaintiff's hobbies as watching television. *Id.* at 320. Ms. Reams indicated that she tries to take Plaintiff for a ride at least once per week. *Id.* Ms. Reams stated that prior to Plaintiff's illness they would travel, hike, and do other outdoor activities together. *Id.* Ms. Reams reported that Plaintiff spends time with others and visits daily with friends and family. AR at 320. Ms. Reams also reported that Plaintiff attends church once a week and doctor's appointments regularly. *Id.* Ms. Reams noted that Plaintiff does not need reminders or someone to accompany her. *Id.* Ms. Reams confirmed Plaintiff's ability to get along with others, but indicated that she does not go out as much because environmental stressors "make her sicker." *Id.* at 321.

Ms. Reams reported that Plaintiff's illness impacted her ability to lift, squat, bend, stand, walk, and climb stairs. *Id.* Ms. Reams further noted that Plaintiff is unable to lift any heavy items and is tired and out of breath after walking or climbing stairs. AR at 321.

1   Ms. Reams indicated that Plaintiff could walk for five (5) minutes before requiring five (5)

2   minutes of rest before resuming.  *Id.*  Ms. Ream confirmed that Plaintiff is capable of

3   finishing what she starts and is able to follow written and spoken directions.  *Id.*  Ms. Reams

4   denied that Plaintiff had ever lost a job due to problems getting along with others.  *Id.* at

5   322.  Ms. Reams noted that Plaintiff had difficulty dealing with stress, but had not given

6   up.  *Id.*  Ms. Reams reported that Plaintiff used a cane, brace/splint, and glasses regularly

7   and all were prescribed.  AR at 322.

8   **II.     STANDARD OF REVIEW**

9          The factual findings of the Commissioner shall be conclusive so long as they are

10   based upon substantial evidence and there is no legal error.  42 U.S.C. §§ 405(g),

11   1383(c)(3); *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008).  This Court may

12   "set aside the Commissioner's denial of disability insurance benefits when the ALJ's

13   findings are based on legal error or are not supported by substantial evidence in the record

14   as a whole." *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999) (citations omitted); *see*

15   *also Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1098 (9th Cir. 2014).

16          Substantial evidence is "'more than a mere scintilla[,] but not necessarily a

17   preponderance.'"  *Tommasetti*, 533 F.3d at 1038 (quoting *Connett v. Barnhart*, 340 F.3d

18   871, 873 (9th Cir. 2003)); *see also Garrison v. Colvin*, 759 F.3d 995, 1009 (9th Cir. 2014).

19   Further, substantial evidence is "such relevant evidence as a reasonable mind might accept

20   as adequate to support a conclusion." *Parra v. Astrue*, 481 F.3d 742, 746 (9th Cir. 2007).

21   Where "the evidence can support either outcome, the court may not substitute its judgment

22   for that of the ALJ." *Tackett*, 180 F.3d at 1098 (citing *Matney v. Sullivan*, 981 F.2d 1016,

23   1019 (9th Cir. 1992)); *see also Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007).

24   Moreover, the court may not focus on an isolated piece of supporting evidence, rather it

25   must consider the entirety of the record weighing both evidence that supports as well as

26   that which detracts from the Secretary's conclusion.  *Tackett*, 180 F.3d at 1098 (citations

27   omitted).

28

1    **III.    ANALYSIS**

2         ***A.    The Five-Step Evaluation***

3         The Commissioner follows a five-step sequential evaluation process to assess

4    whether a claimant is disabled.  20 C.F.R. § 404.1520(a)(4).  This process is defined as

5    follows:  Step One asks is the claimant "doing substantial gainful activity[?]"  20 C.F.R. §

6    404.1520(a)(4)(i).  If yes, the claimant is not disabled.  Step Two considers if the claimant

7    has a "severe medically determinable physical or mental impairment[.]"  20 C.F.R. §

8    404.1520(a)(4)(ii).  If not, the claimant is not disabled.  Step Three determines whether the

9    claimant's impairments or combination thereof meet or equal an impairment listed in 20

10   C.F.R. Pt. 404, Subpt. P, App.1.  20 C.F.R. § 404.1520(a)(4)(iii).  If not, the claimant is

11   not disabled.  Step Four considers the claimant's residual functional capacity and past

12   relevant work.  20 C.F.R. § 404.1520(a)(4)(iv).  If claimant can still do past relevant work,

13   then he or she is not disabled.  Step Five assesses the claimant's residual functional

14   capacity, age, education, and work experience.  20 C.F.R. § 404.1520(a)(4)(v).  If it is

15   determined that the claimant can make an adjustment to other work, then he or she is not

16   disabled.  *Id.*

17        In the instant case, the ALJ found that Plaintiff had not engaged in substantial

18   gainful activity since her alleged onset date of December 1, 2017.  AR at 22.  At step two

19   of the sequential evaluation, the ALJ found that "[t]he claimant has the following severe

20   impairments: degenerative disc disease; peripheral neuropathy, asthma, status post carpal

21   tunnel release (20 CFR 404.1520(c) and 416.920(c))."  *Id.* at 22.  At step three, the ALJ

22   further found that "[t]he claimant does not have an impairment or combination of

23   impairments that meets or medically equals the severity of one of the listed impairments in

24   20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526,

25   416.920(d), 416.925 and 416.926)."  *Id.* at 27.  Prior to step four and "[a]fter careful

26   consideration of the entire record," the ALJ determined that "the claimant has the residual

27   functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b)

28   except she can only occasionally climb ramps and stairs, never climb ladders, ropes, and

scaffolds, frequently balance, and occasionally stoop, kneel, crawl, and crouch." *Id.* at 27. At step four, the ALJ found that "[t]he claimant is capable of performing past relevant work as a hospital billing clerk, receptionist, and customer service representative." *Id.* at 32. Accordingly, the ALJ determined that Plaintiff was not disabled. *Id.*

### B.    Plaintiff's Symptoms

Plaintiff asserts that the ALJ failed to set forth "clear and convincing" reasons for discounting her symptom testimony. Opening Br. (Doc. 21) at 6. Defendant counters that "[t]he ALJ properly evaluated Plaintiff's subjective symptom testimony along with the other record evidence in assessing her RFC, and substantial evidence supports the ALJ's findings[.]" Response (Doc. 22) at 4 (citations omitted). The Court agrees with Respondent and finds the ALJ provided clear and convincing reasons for discounting Plaintiff's testimony, and remand is inappropriate.

### 1.  Legal Standard

An ALJ must engage in a two-step analysis to evaluate a claimant's subjective symptom testimony. *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035–36 (9th Cir. 2007). First, "a claimant who alleges disability based on subjective symptoms 'must produce objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged[.]'" *Smolen v. Chater*, 80 F.3d 1273, 1281–82 (9th Cir. 1996) (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991) (*en banc*) (internal quotations omitted)); *see also Ghanim v. Colvin*, 763 F.3d 1154, 1163 (9th Cir. 2014). Further, "the claimant need not show that her impairment could reasonably be expected to cause the severity of the symptom she has alleged; she need only show that it could reasonably have caused some degree of the symptom." *Smolen*, 80 F.3d at 1282 (citations omitted); *see also Trevizo v. Berryhill*, 871 F.3d 664, 678 (9th Cir. 2017). "Nor must a claimant produce 'objective medical evidence of the pain or fatigue itself, or the severity thereof.'" *Garrison v. Colvin*, 759 F.3d 995, 1014 (9th Cir. 2014) (quoting *Smolen*, 80 F.3d at 1282). "[I]f the claimant meets this first test, and there is no evidence of malingering, 'the ALJ can reject the claimant's testimony about the severity of her

symptoms only by offering specific, clear and convincing reasons for doing so.'" *Lingenfelter*, 504 F.3d at 1036 (quoting *Smolen*, 80 F.3d at 1281); *see also Burrell v. Colvin*, 775 F.3d 1133, 1137 (9th Cir. 2014) (rejecting the contention that the "clear and convincing" requirement had been excised by prior Ninth Circuit case law). "This is not an easy requirement to meet: 'The clear and convincing standard is the most demanding required in Social Security cases.'" *Garrison*, 759 F.3d at 1015 (quoting *Moore v. Comm'r of Soc. Sec. Admin.*, 278 F.3d 920, 924 (9th Cir. 2002)).

### 2. Analysis

The ALJ acknowledged the two-step process for assessing Plaintiff's symptom testimony. AR at 27. The ALJ remarked that "[a]fter careful consideration of the evidence . . . the claimant's medically determinable impairments could reasonably be expected to cause at least the bulk of the basic alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." *Id.* The ALJ went on to review the medical records, weigh the opinion testimony of certain medical professionals, and considered Plaintiff's own statements. *See id.* at 27–32.

SSR 16-3p[6] states, in relevant part:

> We will not evaluate an individual's symptoms based solely on objective medical evidence unless that objective medical evidence supports a finding that the individual is disabled. We will evaluate an individual's symptoms based on the evidence in an individual's record as described below; however, not all of the types of evidence described below will be available or relevant in every case.
>
> * * *
>
> In evaluating an individual's symptoms, it is not sufficient for our adjudicators to make a single, conclusory statement that "the individual's statements about his or her symptoms have been considered" or that "the statements about the individual's symptoms are (or are not) supported or

---

[6] Social Security Rulings are "binding on all components of the Social Security Administration." 20 C.F.R. §§ 402.35(b)(1) and (2); *Heckler v. Edwards*, 465 U.S. 873 n.3, 104 S. Ct. 1532, 79 L. Ed. 2d 878 (1984).

1
2
3
4
5

consistent."  It is also not enough for our adjudicators simply to recite the factors described in the regulations for evaluating symptoms.  The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms.

6
7
8
9
10
11
12

SSR 16-3p, *available at* 2017 WL 5180304, at *5, 10 (October 25, 2017).  "[T]he ALJ is not 'required to believe every allegation of disabling pain, or else disability benefits would be available for the asking, a result plainly contrary to 42 U.S.C. § 423(d)(5)(A).'"  *Molina v. Astrue*, 674 F.3d 1104, 1112 (9th Cir. 2012), *superseded by regulation on other grounds* (quoting *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989)).  Plaintiff "bears the burden of proving that an impairment is disabling."  *Miller v. Heckler*, 779 F.2d 845, 849 (9th Cir. 1985) (citations omitted).

13

### a. 12-month durational requirement

14
15
16
17
18
19
20
21
22
23
24
25
26
27

The ALJ "d[id] not find any 12-month period establishing manipulative limitations or any related exertional limitations precluding light work due [to] the history of carpal tunnel syndrome or any other condition of either upper extremity."  AR at 28.  The ALJ provided a detailed review of the Plaintiff's medical records regarding her carpal tunnel syndrome.  *Id.* at 28–29.  On January 24, 2019, Plaintiff underwent an electrodiagnostic consultation, the results of which suggested moderate left carpal tunnel syndrome.  *Id.* at 586–87.  On May 9, 2019, Plaintiff underwent left carpal tunnel release surgery and a trigger release of the right thumb and index fingers.  *Id.* at 612–13.  As detailed by the ALJ, Plaintiff continued to follow-up with Dr. DeSilva through September 25, 2019.  *Id.* at 28–29, 684–87.  Plaintiff indicated that she had been working with a hand therapist, and that "the carpal tunnel release ha[d] helped much of her symptoms."  *Id.* at 684.  Six months elapsed without further treatment regarding her carpal tunnel, when Plaintiff returned to Dr. DeSilva on March  4, 2020.  AR at 681–82.  Dr. Silva opined that Plaintiff's finger looked good without evidence of triggering, and referred her to hand therapy.  *Id.*  The

28

1  ALJ's finding that Plaintiff did not establish a 12-month period of manipulative limitations
2  is supported by substantial evidence.

3  ### b. Dr. DeSilva's notes

4       The ALJ provided a rational interpretation of the objective medical evidence and
5  notes of treatment providers, which were inconsistent with Plaintiff's subjective
6  complaints. *See Mitchell v. Saul*, 2021 WL 3032667, at *8 (D. Nev. July 16, 2021) (ALJ
7  is allowed to consider whether a "claimant's statements concerning the intensity,
8  persistence and limiting effects of [her] symptoms are not entirely consistent with the
9  medical evidence and other evidence in the record."). After a detailed review with citations
10 to the administrative record, the ALJ concluded that "repeated examinations have shown
11 good results from the surgeries[,] [and] [t]he claimant has made contemporaneous
12 statements of improvement." *Id.* at 29.

13      Plaintiff asserts that "[t]he ALJ's reliance on Dr. DeSilva's dismissive notes is not
14 supported by substantial evidence, and is not a clear and convincing reason to discount Ms.
15 Malone's symptom testimony regarding her hand pain and weakness with handling and
16 fine fingering." Pl.'s Opening Br. (Doc. 21) at 9. Where "the evidence can support either
17 outcome, the court may not substitute its judgment for that of the ALJ." *Tackett*, 180 F.3d
18 at 1098 (citing *Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992)); *see also Massachi
19 v. Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007). The Court finds that the ALJ's reliance on
20 Dr. DeSilva's treatment records was appropriate.

21      ### c. Ability to drive

22      The ALJ noted that "Dr. DeSilva's repeated examinations and comments and the
23 fact the claimant drove to the psychological examination" weighed against the consultative
24 psychologist's observation that "claimant demonstrated very poor grip and could not grip
25 a pen to write." AR at 29. Plaintiff asserts that because Plaintiff "testified that she is unable
26 to spend more than a few minutes seated in a car . . . [s]ubstantial evidence does not support
27 a finding that objective evidence showing significant impairment in handling and fingering
28 is overshadowed by the ability to drive." Plaintiff's contention is without merit. As an

initial matter, an ALJ is entitled to consider "whether the claimant engages in daily activities inconsistent with the alleged symptoms." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1040 (9th Cir. 2007).  The ALJ is also allowed to consider whether a "claimant's statements concerning the intensity, persistence and limiting effects of [her] symptoms are not entirely consistent with the medical evidence and other evidence in the record." *Mitchell*, 2021 WL 3032667, at *8 (alteration in original).  Here, Plaintiff testified that she is able to drive, and does so.  *See* AR at 45, 271, 302, 338.  Plaintiff's testimony, as well as Dr. Silva treatment records, were inconsistent with the observation of Dr. Phelps.  Furthermore, the ALJ's discussion in this regard was limited to Plaintiff's ability to use her upper extremities.  *See id.* at 28–29.  The ALJ properly weighed the evidence as it was his responsibility to do.

### d. Improvement in Hand Symptoms

Plaintiff asserts that the ALJ's finding that Plaintiff "made contemporaneous statements of improvement with respect to her hand . . . is an exaggeration of the record." Pl.'s Opening Br. (Doc. 21) at 10.  The Court will not reweigh the evidence.  Where "the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ." *Tackett*, 180 F.3d at 1098 (citing *Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992)); *see also Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007).  The Court finds that the ALJ's findings regarding Plaintiff's contemporaneous statements well supported by the record.

### e. Physical therapy

Plaintiff concedes that "the medical evidence of record does not contain notes of hand-related physical therapy," but notes the reference to such therapy occurring.  Pl.'s Opening Br. (Doc. 21) at 11 (citation omitted).  Plaintiff asserts that "the ALJ did not explain why he rejected the explanation that physical therapists and/or insurers will only engage in physical therapy for one body part at a time." *Id.*  "A claimant's subjective symptom testimony may be undermined by 'an unexplained, or inadequately explained, failure to . . . follow a prescribed course of treatment. While there are any number of good

reasons for not doing so, a claimant's failure to assert one, or a finding by the ALJ that the proffered [sic] reason is not believable, can cast doubt on the sincerity of the claimant's pain testimony.'" *Trevizo v. Berryhill*, 871 F.3d 664, 679 (9th Cir. 2017) (alteration in original) (quoting *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989)).   In discounting Plaintiff's symptom testimony, the ALJ observed that Plaintiff "has not had any related physical therapy, as one might expect, notwithstanding her current focus on her back."  AR at 29.  The ALJ's observation is correct.  Moreover, Dr. DeSilva referred Plaintiff "to hand therapy for hand sensation and biofeedback" on March 4, 2020.  *Id.* at 618.  Furthermore, Plaintiff did not return to Dr. DeSilva or otherwise notify him that she was unable to proceed with the recommended therapy.  The ALJ did not commit any error in discounting her testimony.  *See Chaudhry v. Astrue*, 688 F.3d 661, 672 (9th Cir. 2012) (quoting *Orn v. Astrue*, 495 F.3d 625, 638 (9th Cir. 2007) ("[I]f a claimant complains about disabling pain but fails to seek treatment, or fails to follow prescribed treatment, for the pain, an ALJ may use such failure as a basis for finding the complaint unjustified or exaggerated[.]")

### f. Reliance on the experience of others

Plaintiff asserts that the ALJ misstated the record because he "was under the impression that Ms. Malone somehow based her allegations of pain off experiences of others."  Pl.'s Opening Br. (Doc. 21) at 11.  The ALJ did misunderstand Plaintiff's statement regarding not wanting to put herself in a keyboarding position; however, this misinterpretation was harmless.  *See Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012) ("[W]e may not reverse an ALJ's decision on account of an error that is harmless.").  The ALJ articulated other clear and convincing reasons for discounting Plaintiff's symptom testimony, and any error in interpretation with this statement does not negate those reasons.

### g. Neurological findings

Plaintiff asserts that the ALJ's reliance on Dr. Schroeder's findings was misplaced because "[t]here [wa]s no indication that Dr. Schroeder believed that Ms. Malone's pain or other symptoms were less than genuine[.]"  Pl.'s Opening Br. (Doc. 21) at 12.  The ALJ provided a thorough and rational interpretation of the objective medical evidence and notes

of treatment providers. *See Mitchell*, 2021 WL 3032667, at *8. The ALJ pointed to continued "negative straight [leg] raising, save for when described as 'theatrically positive,' as well as [] normal neurological findings except when their reliability is questioned." AR at 31. "The ALJ is the final arbiter with respect to resolving ambiguities in the medical evidence." *Tommasetti v. Astrue*, 533 F.3d 1035, 1041–42 (9th Cir. 2008). Furthermore, given Dr. Schroeder's descriptions, it is reasonable to infer that Dr. Schroeder questioned the veracity of Plaintiff's complaints. The Court finds that the ALJ provided specific, clear and convincing reasons for discounting Plaintiff's testimony which is supported by substantial evidence in the record. *See Lingenfelter*, 504 F.3d at 1036; *Tommasetti v. Astrue*, 533 F.3d 1035, 1040 (9th Cir. 2008).

## IV.    CONCLUSION

Based on the foregoing, the Court finds the ALJ properly assessed Plaintiff's symptom testimony. For the reasons delineated above, IT IS HEREBY ORDERED that:

1)    Plaintiff's Opening Brief (Doc. 21) is DENIED;

2)    The Commissioner's decision is AFFIRMED; and

3)    The Clerk of the Court shall enter judgment and close its file in this case.

Dated this 13th day of September, 2022.

Honorable David C. Bury
United States District Judge